UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-07-18-B-W |
| | ) | |
| HORACE W. SALLEY III | ) | |

**PARTIAL ORDER ON MOTIONS FOR NEW TRIAL**

Following a three-day jury trial, Horace W. Salley III moved for a new trial, claiming that the prosecutor violated his Fifth Amendment guarantee against self incrimination by commenting on his decision not to testify. Although the Court finds that the prosecutor did inappropriately comment on the Defendant's failure to testify, the Court concludes that the Government established beyond a reasonable doubt that the prosecutorial error was harmless, and that her language affected neither the outcome of the trial, nor the fairness, integrity, or public reputation of the proceedings.

I.    **STATEMENT OF FACTS**

A.    **The Government's Case – A Brief Overview**

On the third day of trial, a jury found Horace W. Salley III guilty of possession of a firearm by a prohibited person, a violation of 18 U.S.C. § 922(g)(9).[1] The Government's case focused on the whereabouts of a Bushmaster Model 17S Bullpup .223 caliber semi-automatic rifle, tracing it from its purchase at a firearms dealer in New Hampshire to an alleged sale to the Defendant in central Maine and finally to a bedroom closet in the Defendant's home in Smyrna

---

[1] Mr. Salley did not stipulate to his status as a prohibited person. *See Old Chief v. United States*, 519 U.S. 172, 174 (1997); *United States v. Leahy*, 473 F.3d 401, 410 (1st Cir. 2007). Mr. Salley was convicted of assault on July 16, 2003, under a generic misdemeanor assault statute. 17-A M.R.S.A. § 207-A. The Government presented proof that the assault was a domestic assault fitting within the definition of 18 U.S.C. § 921(a)(33)(A). It did so through the testimony of the victim, Heather Dupont. Whether the Government met its burden on this element of the crime is not an issue.

Mills, Maine.  In addition, the Government presented testimony of two witnesses who testified that they saw the Defendant in possession of a similar rifle in Plymouth, Maine during the late fall of 2005.

**B.      The Theory of Defense**

Mr. Salley did not testify.  His defense consisted largely of the theory that Skyla Salley, his ex-wife, framed him.  He contended that she had come penniless into their relationship, that he had money, which she coveted, and once she got his money, she aimed to use the criminal process to get rid of him and, thereby, keep her own children.

**1.      A Complicated Tale**

This complicated tale begins with the complex relationship between Mr. and Ms. Salley, a relationship that Ms. Salley testified was marked by her love and fear of the Defendant.  Mr. and Ms. Salley began dating in May 2005; Ms. Salley had two children from a prior relationship and on June 13, 2005, she learned that she was pregnant by Mr. Salley.  On October 16, 2005, the state of Maine Department of Human Services (DHS) removed her children from her home. Ms. Salley explained that the DHS workers believed Mr. Salley represented a threat to the children, based on allegations that he had physically abused one of his prior girlfriend's children. Ms. Salley acknowledged that DHS was forcing her, in effect, to choose between her boyfriend and her two older children.  On December 13, 2005, Ms. Salley chose her children.  She left Mr. Salley and checked into a women's shelter; on December 16, 2005, she obtained a temporary protection from abuse order against him.

After about a week at the shelter, however, Mr. Salley and Ms. Salley reconnected and she left the shelter to live with him.  She admitted that if the DHS workers discovered that she had moved in with Mr. Salley, it was likely that when the baby was born, DHS would remove

2

the child from her.  On December 28, 2005, while the temporary protection from abuse order was still in effect, Mr. and Ms. Salley were married.

Two days later, December 30, 2005, both a real estate closing and a protection from abuse hearing were scheduled.  Ms. Salley attended the real estate closing with Mr. Salley, but not the protection from abuse hearing.  The real estate closing involved the sale of Mr. Salley's land in Detroit, Maine; the proceeds of that transaction, $23,000.00 in cash, went solely to Ms. Salley.  Ms. Salley used the proceeds to purchase a Smyrna Mills, Maine residence, the title for which was placed solely in her name.

She failed to attend the December 30, 2005 protection from abuse hearing.  Instead, she left with Mr. Salley for New Hampshire where their baby, HS, was born on February 8, 2006.  Ms. Salley conceded that the reason they had gone to New Hampshire to have the baby was to avoid DHS involvement with the child.  After the birth, Mr. and Ms. Salley returned to Maine and they continued to live in her house in Smyrna Mills until the fall of 2006.  During this interval, Mr. Salley worked and, in fact, sustained a workers' compensation injury.

On November 25, 2006, with Mr. Salley out of the house, Ms. Salley called 9-1-1, alleging that Mr. Salley had assaulted her and confirming among other things that he had a firearm.  Trooper Carmen Lilley responded to the 9-1-1 call and found Mr. Salley outside the house.  Trooper Lilley immediately placed Mr. Salley in handcuffs for possible domestic assault.  Mr. Salley denied any assault and Trooper Lilley then placed him in his police cruiser.  Trooper Lilley asked Mr. Salley three different times where the gun was and Mr. Salley responded each time that to his knowledge, there was no gun.  Trooper Lilley proceeded inside the Salley residence and found Ms. Salley in the bedroom.  She told Trooper Lilley about domestic issues

regarding the firearm and said that Mr. Salley had obtained the gun through an ad in Uncle Henry's; she retrieved the weapon from under some clothes in the bedroom closet.[2]

Even after Mr. Salley was arrested in late November 2006, this contentious relationship continued. Ms. Salley initially lived in a shelter and later moved in with Mr. Salley's mother. During this time, Ms. Salley received a message from the defendant through his mother to the effect that he was unhappy with her, that he wanted her to change her testimony about him, and that if she did not do so, he would come after her and the baby. Subsequently, the state of Maine initiated criminal charges against Mr. Salley, based on Ms. Salley's allegations of sexual assault and witness tampering. Around this same period, although the timing is unclear, DHS acted against Ms. Salley to terminate her parental rights to one of her other children and the result was that Ms. Salley's parental rights to this child were terminated.

On January 18, 2007, outside a Superior Court hearing on the pending state criminal charges, Ms. Salley told Rebecca Miller, a victim-witness advocate, that she was recanting her allegations against him. Ms. Miller immediately called DHS and they acted swiftly to remove HS from Ms. Salley that same day. They explained that they thought Mr. Salley was going to get out of jail in the near future and that Mr. and Ms. Salley with their baby represented a flight risk. DHS did not return HS to Ms. Salley until April 2007.

On October 16, 2007, about three weeks before the trial in this criminal case, Ms. Salley was divorced from Mr. Salley. Ms. Salley admitted that if Mr. Salley were released from prison and returned to live with her, DHS would likely reopen the file and remove HS. In fact, Ms. Salley is currently pregnant by another man and she acknowledged that if Mr. Salley were to get out of jail and return to her, she would be at risk of having her new baby removed, after the baby is born.

---

[2] Uncle Henry's is a regional classified ad magazine.

4

### 2.      Mr. Salley's Interpretation

Mr. Salley staked a large part of his defense on the premise that Ms. Salley set him up. He contended that Ms. Salley viewed him as a financial mark.  Despite a roiling relationship with Mr. Salley, including a protection from abuse order that she had obtained just weeks before, she married Mr. Salley on December 28, 2005, and, two days later, he gave her $23,000.00.  She invested the $23,000.00 in the Smyrna Mills home, placing the deed in her name alone.  She had thus succeeded in extracting Mr. Salley's financial resources from him.

Second, Mr. Salley contends that Ms. Salley was in part motivated by hatred.  The evidence establishes that she had reason to dislike him.  She herself acknowledged that he threatened her and her family and that she was afraid of him.  There are currently pending state charges that Mr. Salley sexually assaulted her.

To complete this portrait, Mr. Salley added the ongoing DHS investigations.  DHS had directly threatened to remove her children if Ms. Salley continued to have a relationship with Mr. Salley, and she had temporarily lost two of her own children due to her relationship with him. She knew that as a felon he could not have a firearm and that if she placed a firearm in his possession, he would be sent to jail.  Mr. Salley argued that Ms. Salley was willing to continue to allow him to stay at her house in Smyrna Mills because he was providing for her.  However, she lived with the knowledge that if DHS caught her with Mr. Salley, she could lose all her children.

Pulling this saga together, Mr. Salley contended that when Ms. Salley placed a 9-1-1 call to the police on November 25, 2006, she intended to solve her problems in one fell swoop: having secured his assets, she would rid herself of Mr. Salley and her love-hate relationship with him, retain her children by removing the individual who had sparked DHS to remove her children previously, and succeed in having the police act as her divorce attorneys by placing him

5

in jail for firearms possession.  In sum, Mr. Salley argued that by the time of her testimony in this trial, pregnant by another man, Ms. Salley had obtained his assets, put him in prison, secured custody of H.S., and mollified DHS.

Thus framed, the defense depended upon the jury's firm rejection of Ms. Salley's credibility.  She was the person who had called 9-1-1 and she did so while Mr. Salley was away from the home.  If she obtained the firearm, secreted it, put it in their bedroom closet while Mr. Salley was away, and told the police it was his, she would in effect have sprung the trap.  Thus, whether Mr. Salley knew the firearm was in the bedroom closet was essential to the defense and, correspondingly, to the Government's case.

### C.     The Presentation of the Evidence

The Government called twelve witnesses; Mr. Salley called nine.  The Government called: (1) Heather Dupont, Mr. Salley's ex-girlfriend, who confirmed that Mr. Salley had been convicted of a domestic assault against her; (2) William Steinhagen, the man who sold the firearm; (3) Brent McSweyn, an ATF agent; (4) a Verizon Wireless employee; (6) a Unicel Cell Phone Company employee; (7) a vice president for Uncle Henry's; (8-9) James and David Smith, father and son, who testified that they saw the Defendant with the firearm; (10) Carmen Lilley, a Maine State Trooper; and, (12) Skyla Salley.  The defense called: (1-2) two Smyrna Mills neighbors of the Salleys; (3-5) three caseworkers for DHS; (6) Harrison Cole, who performed the marriage between Horace and Skyla Salley; (7) a state of Maine victim-witness advocate; (8) Joseph Headings, who sold the house to Ms. Salley; and, (8) Rebecca Hughes, who bought the Salley home in Smyrna Mills and had begun to move in before Mr. Salley was arrested.

The significance of the testimony of Rebecca Hughes bears explanation.  Ms. Hughes testified that she purchased the Salley residence in Smyrna Mills and that she began to move in on November 11, 2006.  *Tr.* 382:22-25.  She testified that with the assistance of Travis Brooks and Karl Knight, she boxed up some personal belongings and put them in the residence.  *Tr.* 383:3-19.  Ms. Hughes' activity took place before November 25, 2006, when Mr. Salley was arrested, leaving at least the implication that Ms. Hughes herself, one of her friends, or someone else with access to the Salley residence left the firearm there.

### D.    The Prosecutor's Closing Argument

During her Closing, the prosecutor focused on this critical question:  did Mr. Salley know that the firearm was in his bedroom closet:

> The bottom line is the gun that Mr. Steinhagen bought in New Hampshire was recovered from the defendant's bedroom on the date alleged in the indictment. There's been no suggestion that it was planted there.  <u>There's been no suggestion that Mr. Salley didn't know it was there</u>.  And, there's been no suggestion that that wasn't his bedroom.  The government suggests that on this evidence that you've heard over the last few days you have more than enough to determine beyond a reasonable doubt that Horace Salley knowingly possessed this firearm.

*Tr.* 402:7-13 (emphasis added).

## II.    Discussion

### A.    The Prosecutor's Comment

The prosecutor's comment in the closing argument is problematic.  First, it is an inaccurate statement of the evidence.  Trooper Lilley testified that before he entered the Salley residence, he asked Mr. Salley three times about a firearm and each time Mr. Salley denied knowledge of it.  Contrary to the prosecutor's argument, there had been a suggestion from Mr. Salley himself, confirmed by the Government's own witness, that he was unaware there was a firearm in the residence.

Second, Mr. Salley maintains that the prosecutor's argument improperly implies that he has a burden of proof to demonstrate that he did not know the gun was there. This is a closer call. The comment could be viewed as a call for the jury to consider that the Defendant had failed to rebut the Government's proof.

In response, the Government notes that the Defendant did put on a defense, including a number of witnesses, and suggested an alternative theory: that Ms. Salley (perhaps in collaboration with others) had set him up. The Government is correct that "[w]hen a defendant advances a 'theory of the case' this opens the door to an appropriate response by the prosecution, commenting on the 'quality of his . . . witnesses or . . . attacking the weak evidentiary foundation on which the defendant's theory of the case rested." *United States v. Roberts*, 119 F.3d 1006, 1015 (1st Cir. 1997) (quoting *United States v. Savarese*, 649 F.2d 83, 87 (1st Cir. 1981)). Thus, the Government "in its response, has some leeway to comment on the defendant's failure to produce evidence supporting the defendant's stated theory." *Id.* However, *Roberts* emphasized that the door is "not open to the prosecutor's using such an occasion to comment, even indirectly, on the defendant's failure to testify." *Id.*

This leads to the final and most serious concern: prosecutorial commentary on the Defendant's failure to take the stand. Based on the evidence at trial, only two people had personal knowledge about whether Mr. Salley actually knew the firearm was in the residence: Mr. Salley himself and Ms. Salley. The evidence as to his actual knowledge was contradictory: in his statements to the Trooper, Mr. Salley denied knowledge; in her testimony, Ms. Salley said it was his gun and he knew it was there. The only means by which Mr. Salley could have produced additional evidence that he did not know the gun was in the closet would have been to take the stand and deny it. He had elected not to do so and to rely on his Fifth Amendment

privilege not to testify.  The prosecutor owed a duty not to comment or allude to his assertion of that right.

The question is whether she did so.  Her comment, "[t]here's no suggestion that Mr. Salley did not know it was there," is troubling in two ways:  (1) it is directed to Mr. Salley himself and, (2)  it is directed to Mr. Salley's knowledge.  This statement went straight to the Defendant's knowledge, an element that the Government is allowed to prove by circumstantial evidence, but about which the Defendant is uniquely qualified to testify.  Assuming that by using the term "suggestion" the prosecutor was referring to evidence and not to the burden of proof, the danger becomes more apparent.

### B.      Legal Overview

The Fifth Amendment's guarantee against self incrimination is violated by "any comment by a prosecutor on a defendant's exercise of the right to remain silent . . . ."  *United States v. Henderson*, 320 F.3d 92, 107 (1st Cir. 2003).  In this case, the critical issue is whether the statement "[t]here's been no suggestion that Mr. Salley didn't know it was there," is prosecutorial commentary on the failure of the defendant to testify.  If yes, the comment is "a constitutional error, and the burden rests with the government to show the error harmless beyond a reasonable doubt, not with the defendant to show the comment was harmful."  *United States v. Wihbey*, 75 F.3d 761, 772 n.6 (1st Cir. 1996).  If no, it is a "non-constitutional inappropriate comment, [and] the burden rests with the defendant to show that the comment was harmful, i.e., that under the totality of the circumstances they affected the trial's outcome.  *Id.*  (citation omitted).  To determine if this comment triggers the protection of the Fifth Amendment, the Court inquires, "whether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it

to be a comment on the failure of the accused to testify." *United States v. Akinola*, 985 F.2d 1105, 1111 (1st Cir. 1993) (citation omitted).  If the comment is considered a reference to the failure of the accused to testify, the Court normally reviews such language for harmless error. *Id.*  However, if no contemporaneous objection was raised at the time the comment was made, the Court reviews for "plain error, i.e., error that is clear and obvious and that was prejudicial to the defendant in that it affected the outcome of the District Court proceedings.  And, we exercise that discretion only if the plain forfeited error seriously affects the fairness, integrity, or public reputation of judicial proceedings . . . ." *Wihbey*, 75 F.3d at 769 (quoting *United States v. Olano*, 507 U.S. 725, 732-34 (1993)) (internal punctuation omitted).  In this case, the Defense did not raise a contemporaneous objection.

**C.      Analysis of the Plain Error Standard**

**1.      Inappropriate Prosecutorial Comment**

The statement "[t]here's been no suggestion that Mr. Salley didn't know it was there," is effectively a comment on Mr. Salley's failure to testify.  At oral argument, the prosecutor assured the Court that she was not referring to Mr. Salley's failure to take the stand.  She pointed out that the Defendant had elicited testimony that some people had moved items of personal property into the Salley home before November 25, 2006.  She explained that she was referring, among other things, to the failure of the defense to produce any evidence that these people – or anyone else – claimed that the firearm was theirs.  In effect, she meant to say:  None of the defense witnesses <u>suggested</u> that Mr. Salley did not know the gun was there.[3]

---

[3] This area is irreducibly tricky for the Government.  There is a tension between the right to comment on holes in the defense theory and the obligation not to comment either on the failure of the defendant to take the stand or on a defense burden of proof.  The prosecutor has a much freer hand in discussing the strength of the Government's case and why it sustained its burden of proof.  By contrast, when the prosecutor's argument turns to the weaknesses in the defendant's case, especially when the defendant has not testified, the prosecutor has a compelling obligation to be especially clear and careful and must navigate between twin shoals, avoiding any reference to the defendant's Fifth Amendment privilege and any implication that the defendant bears a burden of proof.

Unfortunately, that is not what she said. If the prosecutor intended to refer to the defense failure to produce witnesses to confirm the gun was theirs, she should have said so. There is no context around the comment that reflects she was referring to the people who were moving boxes into the Salley home before November 25, 2006; she did not mention by name Rachel Hughes, Travis Brooks, or Karl Knight, nor did she refer to unnamed individuals. If the prosecutor had intended to argue, consistent with *Roberts*, that the defense theory of the case was not supported by the evidence, again, she should have said so.

Instead, she made a direct reference to Mr. Salley, not to other witnesses, arguing that there is no suggestion that <u>Mr. Salley</u> did not know the gun was there. Particularly in view of Mr. Salley's earlier denials to the trooper, the Court finds that the prosecutor's comment would likely have been seen as a reference to his failure to take the stand and confirm under oath that he did not possess the requisite degree of knowledge of the firearm's presence to sustain a conviction.[4]

The Court is not required to adopt the most negative interpretation of the prosecutor's comment. *See United States v. Glantz*, 810 F.2d 316, 323 (1st Cir. 1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("Although the prosecutor's language obviously was susceptible to more problematic interpretations, we find the Supreme Court's language . . . to be particularly appropriate here: 'A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.'")). But, here, the prosecutor's comment was not ambiguous, and there are not a "plethora of less

---

[4] In addition, it may be that the comment "impermissibly suggested that [the Defendant] bore the burden of proof." *Wihbey*, 75 F.3d at 770. But, this is a closer issue and the Court does not resolve that question. At the same time, the First Circuit has repeatedly instructed against prosecutorial implications that the defendant bears any burden of proof. *See id.*; *United States v. Skandier*, 758 F.2d 43, 45-46 (1st Cir. 1985) (holding that a "how-does-counsel-explain" argument is a *Griffin* violation and an impermissible shift of the burden of proof).

damaging interpretations." *Id.* In the context of the evidence in the case, the Court reluctantly concludes that the prosecutor remarked on Mr. Salley's failure to take the stand. The Court accepts the prosecutor's representation that she did not intend to do so and under *Akinola*, the Court concludes her language was not "manifestly intended" to comment on the exercise of the Fifth Amendment privilege. *Akinola*, 985 F.2d at 1111.

Nevertheless, the Court also concludes that the comment was "of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Id.*; *compare Wihbey*, 75 F.3d at 769 (Finding the prosecutor's comment – "There's just no other explanation except the one that's been provided from the witness stand by the eight witnesses called by the government" – to effectively be commentary on Wihbey's failure to testify.), *and United States v. Flannery,* 451 F.2d 880, 882 (1st Cir. 1971) (finding that the prosecutor's statement regarding "uncontradicted" government testimony impermissible, when "contradiction" would have required defendant to testify), *with United States v. Wilkerson*, 411 F.3d 1, 9 (1st Cir. 2005) (Finding the prosecutor's comment – "there's no real evidence" that defendant did not go up the alley and "pretty much nothing" to say that defendant ran up driveway – within the context of trial, to likely refer to "Wilkerson's failure to produce other evidence supporting his theory of the case. At most, the comments are ambiguous."), *and United States v. Babbitt*, 683 F.2d 21, 23-24 (1st Cir. 1982) (finding no error in the comment: "While you search out the truth you may wish to ask yourself, 'Who has appeared before me in the form of a witness?'").

### 2.    The Impact on the Outcome of the Trial

Despite the prosecutor's comment, the Court concludes that her language did not affect the outcome of the trial, nor did it seriously affect the fairness, integrity, or public reputation of

the proceedings.  There was a virtual mountain of evidence of Mr. Salley's guilt.  First, by calling the victim, Heather Dupont, the Government established that Mr. Salley had been convicted of domestic assault.  There is no question but that Mr. Salley was a prohibited person under 18 U.S.C. § 922(g)(9).

Next, the Government was required to demonstrate that the firearm had been "shipped or transported in interstate . . . commerce."  *Id.* § 922(g).  If the Government established that Mr. Salley possessed the Bushmaster firearm, the evidence demonstrated that Mr. Steinhagen purchased the firearm in New Hampshire, traveled to Maine, and sold it here.  This is sufficient to satisfy the interstate nexus requirement.

This leaves as the last question: whether Mr. Salley possessed the firearm that Trooper Lilly found in the Salley closet.  The Government called Mr. Steinhagen as a witness.  Mr. Steinhagen, who is resident of New Hampshire, said that he had purchased a Bushmaster Bullpup M17S rifle with a specific serial number at Skip's Gun Shop in Bristol, New Hampshire. He identified the Bushmaster that was found in the Salley residence as the same firearm he bought in New Hampshire.  After he acquired the Bushmaster, he said that in late 2005, he responded to an ad in Uncle Henry's that advertised a 1946 Chevy coupe, called the phone number in the ad, and spoke to a man.  After some discussion, they agreed on a trade:  the Bushmaster and a four-wheeler for the 1946 Chevy coupe.  Mr. Steinhagen drove to central Maine, met a man he could not identify, and made the swap.

The Government introduced into evidence the Uncle Henry's ad that drew Mr. Steinhagen's attention.  The ad had Mr. Salley's cell phone number as a contact number and the Government introduced cell phone records which demonstrated that Mr. Steinhagen called Mr.

Salley's cell phone not only when he initially made the deal, but as he approached the location in central Maine where they had agreed to meet.

The Government called David and James Smith, residents of Plymouth, Maine, who knew Mr. Salley.  David Smith testified that Mr. Salley came to their home in the fall of 2005 during hunting season.  He said that Mr. Salley was doing a trade with his father, James Smith, that Mr. Salley arrived at the Smith residence, and that he and Mr. Salley each shot the Bushmaster rifle in the Smith backyard.  James Smith confirmed that he saw Mr. Salley holding the gun as he proceeded past the house with David Smith.  He said he did not see anyone fire the gun, but he heard rapid shots, consistent with a semi-automatic firearm.  James Smith also testified that Mr. Salley had owned a Chevy coupe, the same type of automobile Mr. Steinhagen received in trade.

Finally, there was the testimony of Skyla Salley.  Ms. Salley knitted together the disparate parts of the story.  She said that she was present at many critical events: when Mr. Salley received the phone call from Mr. Steinhagen, when Mr. Salley made the trade for the rifle, when Mr. Salley went to the Smiths' residence and shot the gun, and when Mr. Salley brought the firearm into their home in Smyrna Mills.  She also was the one who made the 9-1-1 call to the police and she was present when Trooper Lilly discovered the firearm in the bedroom closet.

The defense theory that Ms. Salley set up Mr. Salley to extract his money and put him in jail to satisfy DHS is not entirely implausible.  However, even if Ms. Salley's testimony were discounted, the collective testimony of William Steinhagen, David Smith, and James Smith still places the Bushmaster in Mr. Salley's possession.  Mr. Steinhagen called Mr. Salley's cell phone number both to make the deal and as he approached the site of the swap, and the Smiths each saw Mr. Salley with the firearm.  To accept the defense theory, someone else in cahoots with Ms.

Salley gained access to Mr. Salley's cell phone and traded a Chevy coupe for a Bushmaster rifle in the fall of 2005. Whatever happened to the rifle between the fall of 2005 and November 25, 2006, it reappeared in the Salley bedroom after Ms. Salley made the 9-1-1 call.

It would take a giant leap to conclude that Ms. Salley engaged in such a long, complex, well-concealed conspiracy to frame her husband. The timing is off. If Ms. Salley (or her accomplice) got the firearm in the fall of 2005, there would be no obvious reason she would have waited until the fall of 2006 to call the police and turn him in. The intervening events are inconsistent. Again, if she had the firearm in the fall of 2005 and wanted to wait to obtain his money, she could have accomplished this right after he transferred his money to her on December 30, 2005, when she got sole title to the Smyrna Mills house. Further, her post-arrest conduct is at odds with the defense theory. She initially said she was recanting her testimony against Mr. Salley and later recanted her recantation. The evidence fails to paint the portrait of the scheming and manipulative person Mr. Salley's theory portrays. Furthermore, there was no evidence that anyone – other than her – would have had the motive and opportunity to become her accomplice.

Moreover, none of this explains the testimony of the Smiths, who placed the firearm in Mr. Salley's hands in the fall of 2005. To accept the defense theory, the Smiths would have had to be part of the conspiracy against Mr. Salley and there is no evidence they were.

Against this cumulative evidence is the single sentence by the prosecutor in the course of a closing argument, a sentence that itself requires some parsing to understand its inappropriateness, which may explain the Defendant's failure to object. Moreover, the Court instructed the jury on the Defendant's right to not testify and on the Government's burden of

proof.[5]  The prosecutor's isolated comment in the midst of a closing argument was thus mitigated by the Court's jury instructions.  The Court concludes that the Government has established beyond a reasonable doubt that the prosecutorial error was harmless, and that her language affected neither the outcome of the trial, nor the fairness, integrity, or public reputation of the proceedings.

### D.  Defendant's Outburst as Grounds for a New Trial

On the last day of trial while the jury was in the courtroom, Mr. Salley suddenly stood up and exclaimed "I, Horace Salley, have not been adequately represented by Mr. Smith."  *Tr.* 370:9-10.  Mr. Salley's attorney immediately approached sidebar and moved for a mistrial.  *Tr.*

---

[5] The relevant portions of the jury instructions are as follows:

> Constitutional right not to testify.  Horace Salley has a constitutional right not to testify, and no inference or suggestion of guilt or of anything else may be drawn from the fact that he did not testify. For any of you to draw such an inference or suggestion would be wrong; indeed, it would be a violation of your oath as a juror.

*Tr.* 423:6-11.

> Presumption of innocence.  It is a cardinal principle of our system of justice that every person accused of a crime is presumed to be innocent unless and until his guilt is established beyond a reasonable doubt.  The presumption is not a mere formality.  It is a matter of the most important substance.
>
> The presumption of innocence alone is sufficient to acquit a defendant unless you are satisfied beyond a reasonable doubt of his guilt after considering all the evidence. The defendant before you, Horace Salley, has the benefit of that presumption throughout the trial, and you are not to convict the defendant unless you are persuaded of his guilt beyond a reasonable doubt.
>
> Proof beyond a reasonable doubt.  In a criminal case, the burden is at all times upon the government to prove guilt beyond a reasonable doubt.  The law does not require that the government prove guilt beyond all possible doubt.  Proof beyond a reasonable doubt is sufficient to convict.  This burden never shifts to Horace Salley.  It is always the government's burden to prove each of the elements of the crime charged beyond a reasonable doubt.  Mr. Salley has the right to rely upon the failure or inability of the government to establish beyond a reasonable doubt any essential element of an offense charged against him.
>
> Before you may convict Mr. Salley, the government's evidence must satisfy you beyond a reasonable doubt of his guilt of the particular offense charged.  If, after fair and impartial consideration of all the evidence, you have a reasonable doubt as to Mr. Salley's guilt of the charged offense, it is your duty to acquit him. On the other hand, if, after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of Mr. Salley's guilt of the charged offense, you should vote to convict him of that offense.
>
> A reasonable doubt does not mean a mere possibility that Mr. Salley may not be guilty; nor does it mean a fanciful or imaginary doubt, nor one based upon groundless conjecture.  It means a doubt based on reason.  A level of proof that requires you to indulge in conjecture, surmise, or suspicion in order to reach a conclusion of guilt does not constitute proof beyond a reasonable doubt.

*Tr.* 417:17-419:7

371:15-16.  The Court excused the jury.  *Tr.* 371:19-20.  There was some confusion about what Mr. Salley had actually said and whether the jury had understood it.  *Tr.* 372:10-25; 373:1-6. After an extended colloquy with the Defendant, the Court denied the motion for mistrial and when the jury was brought back into the courtroom, instructed the jury "to disregard [the comment], take it out of your mind, just as if it never happened." *Tr.* 381:19-20.

Mr. Salley now argues that this outburst, "so close to the end of the trial and likewise close proximity to the Government's contested remarks created a cumulative effect in the final critical state of the trial which should require a new trial."  *Def.'s Supplemental Mot. for New Trial* at 1 (Docket # 124).  To start, "it is well established that a defendant generally may not benefit through his own misconduct."  *United States v. Cunningham*, 194 Fed. Appx. 582, 585 (11th Cir. 2006).  In *Cunningham*, the Defendant's outburst was severe enough to require the courtroom security officers to "activate the stun belt Cunningham was wearing and then "tackle" him to the floor . . . ."  *Id.*  Despite this series of events, the Court found that "[t]here is no indication the jury was prejudiced by Cunningham's outburst, or by the subsequent security measures taken to subdue him," and "[e]ven if the jurors were prejudiced by Cunningham's outburst, the security response to that outburst, and the district court's explanation that trial delays were caused by Cunningham, he may not require a mistrial through his own misconduct." *Id.*

In this case, the Court, when the jury returned, provided an immediate instruction to the jury to disregard the comment made by Mr. Salley.[6]  At the time of the outburst, it was unclear what exactly Mr. Salley had said, and there is no indication that the jurors were prejudiced by his

---

[6] The Court instructed:

> Ladies and gentlemen, just before you left, the defendant stood up and said something; I'm not sure if you understood what he said; I'm not sure if it -- what he said would have any impact on you.  But I am instructing you now simply to disregard it, take it out of your mind, just as if it never happened. *Tr.* 381:15-20.

statement.  As noted by other courts, if a defendant "were allowed to obtain a new trial because of his inappropriate outburst, any defendant in the future could sabotage his case and ensure a new trial on appeal by engaging in inappropriate or obstreperous conduct."  *Williams v. Calderon*, 48 F. Supp. 2d 979, 1027 (C.D. Cal. 1998); s*ee also United States v. Stewart,* 256 F.3d 231, 242 (4th Cir. 2001) (finding that "granting [the Defendant's] mistrial motion on the basis of [his] own misconduct would subvert the judicial process and allow [the Defendant] to benefit from his own wrongdoing."); *United States v. Harris,* 2 F.3d 1452, 1456 (7th Cir. 1993) (holding that the defendant was not entitled to a mistrial as the result of his own outburst during trial because to grant the mistrial would allow the defendant to profit from his own wrong).  Mr. Salley's outburst is not grounds for a new trial.

## III.    CONCLUSION

The Court <u>DENIES</u> the Defendant's Motion for a New Trial (Docket # 106) and <u>DENIES</u>, in part, his Supplemental Motion for a New Trial (Docket # 124).[7]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE


Dated this 12th day of May, 2008

---

[7] The Court has granted the Defendant's oral Motion to Amend his Supplemental Motion for a New Trial (Docket # 147).  This decision, therefore, is a partial resolution of the motion for new trial and leaves for later a final resolution of another matter that the parties are in the process of investigating.